# CHARLESTON.

D. M. JARRETT *et al. v.* BOARD OF CANVASSERS.

(No. 5305.)

Submitted December 15, 1924.     Decided December 22, 1924.

ELECTION—*Election Certificates Prima Facie Evidence, Ballots Primary Evidence if Not Changed or Tampered With.*

Certificates made by the commissioners at the precincts are prima facie evidence of the result of an election. The ballots, if identified as the same cast at the election precincts, are primary and higher evidence; but to continue the ballots as controlling evidence, it must appear that they have been preserved in the manner and by the officers prescribed by the statute, and that while in such custody they have not been changed or tampered with.

Original Jurisdiction.

Writ of mandamus petitioned for by D. M. Jarrett and others directed against the Board of Canvassers of Boone County.

*Writ awarded.*

*Price, Smith & Spilman* and *D. C. Howard, Murphy, Bratton,* and *Beverly Brown,* for relators.

*Poffenbarger, Blue & Dayton,* and *Leftwich & Shaffer,* for respondents.

MILLER, JUDGE:

The relators D. M. Jarrett, A. W. Garnett, Irving Sutphin, Bruce Allen and J. G. Edelman, respectively candidates on the Democratic ticket for the offices of house of delegates, prosecuting attorney, sheriff, county commissioner

and assessor of Boone County, at the general election held
November 4, 1924, seek by mandamus to compel the respon-
dents B. D. Banks, St. Clair Miller and A. G. Hager, com-
missioners of the county court of Boone County, and ex-
officio members of the board of canvassers of said county,
to disregard as evidence of the result of the election the bal-
lots cast in all the precincts of said county, to disregard the
result found by a recount of said ballots, and to accept the
returns as certified by the commissioners of election from
all the precincts of said county as primary evidence of the
result of the said election. The further prayer of the petition
is that if this court shall be of opinion not to grant the re-
lief prayed for as above, "then and in that event a writ of
mandamus may be awarded against the said defendants
* * * commanding them to forthwith disregard as evidence
the ballots cast at Precinct No. 1 of Sherman District, as
evidence of any character showing the result of the election
in said precinct, and that in lieu and stead thereof they take
and use the certificates of the election commissioners of said
Precinct No. 1 of Sherman District as primary evidence of
the result of the election in said precinct on the 4th day of
November, 1924, and that they be further commanded to
forthwith hear and consider full and complete evidence of the
relators with reference to the manner in which the ballots
from Peytona Precinct No. 4 and Washington Precincts Nos.
1 and 3 were kept and preserved from the time they were
delivered by the boards of election commissioners to the mes-
sengers to the time when they were opened by the defendants,
acting as a board of canvassers," etc.

From the record it appears that the canvass of the returns
of the thirty-three precincts in the county showed the fol-
lowing majorities for relators:  Jarrett, 85 votes; Garnett,
53 votes; Sutphin, 17 votes; Allen, 59 votes; and Edelman,
158 votes. Upon the completion of the canvass the respective
Republican opponents of the relators demanded a recount
as to the offices for which they were candidates, as a result
of which the board found the following majorities for the
contestants:  Andrews, for the house of delegates, 27 votes;
Hager, for prosecuting attorney, 153 votes; Jarrell, for

sheriff, 117 votes; Harless, for county commissioner, 246 votes; and Hill, for assessor, 174 votes. In twenty- nine of the election precincts the recount showed very slight changes from the returns as canvassed. In four precincts, those named in the alternative prayer of relators' petition, the contestants, in the order above named, gained respectively 109, 211, 210, 296, and 322 votes. About 675 ballots were cast in these four precincts.

Alleging irregularities in the manner in which the ballots had been handled from the time they were delivered to the clerk of the county court by the election officers to the time of the recount, relators requested permission to call witnesses and introduce evidence in support of their contention. A number of witnesses were examined for the purpose of showing that the ballots cast at Sherman No. 1 precinct had been tampered with and had lost their value as primary evidence of the result of the election in that precinct. Upon the evidence, the board of canvassers ruled against relators' motion to disregard the result of the recount as to Sherman No. 1 precinct. Thereupon relators offered to introduce evidence to impeach the integrity of the ballots from the other three precincts in question. The board held that it was unnecessary to continue the hearing, on the ground that it would establish nothing further than had been proven in the case of Sherman No. 1 precinct.

From the evidence adduced on the hearing before the board of canvassers, it appears that the ballots from Sherman No. 1 precinct were delivered to the clerk of the county court on the day following the election, as were the ballots from a number of other precincts. The packages containing these ballots were sealed with wax as provided by law, and the names of the election commissioners were written across the flaps of the envelopes on the lines printed there for that purpose. The county clerk and some of his employees testified that the ballots were placed in the vault or record room at night, but in the day time were brought out and deposited on the floor of the work room of the clerk's office, where they might be under the observation of the clerk, and because a number of persons had access to and used the records in the

vault during office hours. For a few days the envelopes containing the ballots were exposed in the office, after which time, the clerk is not sure when, he locked them up in ballot boxes, where they were kept until called for by the board of canvassers. There is some evidence that armed guards, provided by each of the political parties, were on duty at or around the court house. Just what opportunity they had to observe at all times persons who might have had access to the packages containing the ballots, does not clearly appear. The vault or record room was secured by vault doors provided with combination locks. Besides the county clerk, three of his employees knew the combination to the locks on the vault doors and had keys to the office.

When the canvassing board convened on Monday, November 10th, it was found that the poll books and tally sheets for four of the precincts had been, by mistake of the election officers, sealed up in the envelopes with the ballots. It clearly appears that one of these precincts was Sherman No. 1, but no one was able to say positively from which of the other thirty-two precincts the poll books and tally sheets were missing, though there is some evidence that one of them was Peytona No. 4. Before beginning the canvass the three members of the board and the county clerk opened up the envelopes in which the poll books and tally sheets had been placed, by breaking the wax seals and opening the envelopes at the place where they had been sealed by the election officers. The books and tally sheets were removed, and the original envelopes again sealed with wax, without removing the ballots therefrom. The board then proceeded to canvass the vote with the result above stated. The record of the board shows that the canvass was completed the next day, but it does not appear on which day the envelope from Sherman No. 1 precinct was opened and canvassed.

Relators introduced evidence for the purpose of proving that the envelope containing the ballots from Sherman No. 1 precinct had been tampered with before it was opened on the morning of the canvass. It appears that the election officers placed on the wax seals the impression of a silver twenty-five cent piece. When the envelope was first opened

by the members of the canvassing board, neither they nor the county clerk noted such impression on the seals. None of them were able to say whether or not the impression was then visible. But one J. M. Hatfield, who was present at the time, and who says he had been informed that the seals had been so marked, testified that he looked carefully for the impression, and that the seals showed no evidence of it.

The testimony of the county clerk and others is that after the clerk had given the Democratic county committee permission to place guards in the hall of the court house just outside his office door on the afternoon of November 5th, the sheriff, a Republican, later in the evening had the lights in the court house turned off and directed the guards to remain on the outside of the building, giving for his reason for so doing that the batteries furnishing current for the lights were low. But it appears that during the night some of the Republican contestants for the offices in controversy and Republican county officers and their employees were in the building. One of the candidates remained in the building until morning. He testified that he slept in a room occupied by the state road engineer, together with the engineer and the witness Mooney, and that he left early in the morning while the other two were asleep. Mr. Mooney also testified that he, the candidate and the engineer slept in the court house that night. A number of witnesses said that Democrats were not permitted to enter the court house at night.

The question presented, on the evidence adduced, is whether or not the ballots were cared for by the proper officers between the date of the election and time when they were opened by the board of canvassers in such manner as to prevent opportunity for tampering with them; and is there evidence that the ballots were tampered with? Does not the evidence show ample opportunity to persons not entitled to custody of the ballots to tamper with them? They were for some days in exposed envelopes on the floor of the work room of the clerk's office, where during office hours many persons were coming and going. Others than the clerk knew the combinations to the vault where the ballots were stored at night. It is proved that the canvassing board opened some of the

envelopes and resealed them. Why could others not do so? For it appears that the members of the board did not examine carefully the seals, except to see that the packages were sealed before opening them. The clerk testified that he was not present every afternoon when the ballots were placed in the vault; and he was not in the working room at all times when the packages were deposited on the floor there. Many persons had access to the office during the day, and a number of them were vitally interested in the result of the recount afterwards had.

And we have the positive testimony of the witness J. M. Hatfield that the seals on the envelopes from Sherman No. 1 precinct did not bear the impression of the silver twenty-five cent piece when opened on Monday morning, November 10th, which the evidence shows conclusively was placed there by the election officers; and none of the members of the canvassing board nor the county clerk saw it when the seals were broken by them. Surely someone of them would have seen this if it had been there at the time.

It seems improbable that a difference of 322 majority would occur between the returns of the election officers and the recount in a total of 675 ballots; and we think this is some evidence of tampering where there is other evidence and opportunity to tamper with the ballots. See *McKinzie et al.* v. *Hatfield, Mayor, etc.*, 77 W. Va. 508. But this fact alone would not be prima facie evidence of tampering, if no other evidence appeared. The purpose of a recount is to test the accuracy of the returns of the election officers, and usually there is more or less discrepancy between the two counts.

In *Stafford* v. *Sheppard*, 57 W. Va. 84, this court held: "Certificates of the result of an election, made by the commissioners at the precincts, are *prima facie* evidence of the result of an election. The ballots, if identified as the same cast, are primary and higher evidence; but, in order to continue the ballots as controlling evidence, it must appear that they have been preserved in the manner and by the officers prescribed by the statute, and that, while in such custody, they have not been changed or tampered with." See also, *Dent* v. *Board of Canvassers*, 45 W. Va. 750; *McKinzie* v.

*Hatfield, supra; State* v. *Robinson,* 88 W. Va. 711. And according to some authorities the ballots will continue as controlling evidence only when the party who offers them in evidence shows that they have not been tampered with since the election. 20 C. J. 252; 9 R. C. L. 1165, and cases cited; *Albert* v. *Twohig, Clerk,* 35 Neb. 563. In *Stafford* v. *Sheppard, supra,* it was said that oral evidence is not admissible to repel a prima facie case of tampering presented by the very appearance of the broken containers.

We are of opinion that the board of canvassers erred in holding that the ballots were the best evidence of the result of the election held in Sherman No. 1 precinct, and in refusing to hear evidence as to the integrity of the ballots from Peytona No. 4, and Washington Nos. 1 and 3 precincts.

The writ prayed for giving relief to the extent above indicated will be awarded.

*Writ awarded.*